CATHEDRAL PARK CONDOMINIUM COMMITTEE, Petitioner,

v.

DISTRICT OF COLUMBIA ZONING COMMISSION, Respondent.

and

The Klingle Corporation, Intervenor.

No. 98–AA–59.

District of Columbia Court of Appeals.

Argued Sept. 7, 1999.

Decided Jan. 20, 2000.

against bicycle-riding on sidewalks. 18 DCMR § 4029.

Andrea Newmark, with whom Robert M. Green, Washington, DC, was on the brief, for petitioner.

Phil T. Feola, with whom Whayne S. Quin and Paul J. Kiernan, Washington, DC, were on the brief, for intervenor.

Jo Anne Robinson, Principal Deputy Corporation Counsel, and Charles L. Reischel, Deputy Corporation Counsel, filed a statement in lieu of brief for respondent.

Before FARRELL, REID and GLICKMAN, Associate Judges.

GLICKMAN, Associate Judge:

In this case we review the decision of the District of Columbia Zoning Commission ("the Commission") to approve construction, and associated rezoning, of a Planned Unit Development adding a new wing to the Kennedy–Warren apartment building on Connecticut Avenue, N.W. The active parties in this appeal are petitioner Cathedral Park Condominium Committee, representing unit owners in a building across the street from the proposed new wing who oppose the project,

and intervenor The Klingle Corporation ("Klingle"), the owner of the Kennedy–Warren property. For the most part, we uphold the decision of the Commission. For the reasons specified herein, however, we vacate the Commission's order approving the project and remand for further consideration of whether the Planned Unit Development application is "not inconsistent" with certain discrete provisions of the Comprehensive Plan for the National Capital.

### I.

The project at issue in this case involves the construction of a nine-story addition to the Kennedy–Warren apartment building at 3133 Connecticut Avenue, N.W. Built in the 1930s, the Kennedy–Warren is listed as a historic landmark in the District of Columbia Inventory of Historic Sites and in the National Register of Historic Places, "in recognition," according to the Commission, "of its exceptional architectural design and its contribution to the historical development of the apartment house in Washington." The building is located on a unique site in Ward 3 comprising over 113,000 square feet of land abutting the National Zoological Park to the south and east, Klingle Valley (a tributary valley of Rock Creek Park) to the north, and Connecticut Avenue to the west. Several large apartment buildings, including the Cathedral Park Condominiums, face the Kennedy–Warren site across Connecticut Avenue, but otherwise the site has no adjoining residential uses.

A large portion of the Kennedy–Warren site is undeveloped, including an area that is immediately to the north of the National Zoo and across Connecticut Avenue from the Cathedral Park Condominiums. This area has been vacant since the apartment building was constructed in the 1930s and

is planted with grass, some trees and other vegetation. The original 1930 design for the Kennedy–Warren apartment complex contemplated the erection of a south wing in this location. Although that design was approved in the 1930s under the then applicable (and long since superseded) zoning regulations, plans to build the south wing were abandoned as a consequence of the Depression, and the wing was never built. Klingle now proposes to build the south wing, adhering closely to the original 1930 exterior architectural designs. The proposed addition, which would occupy approximately 22,000 square feet of the "green space" at the site, would add 166 rental units to the Kennedy–Warren. It would also include 204 fixed parking spaces in an underground garage (with capacity for an additional 96 spaces in the garage through attendant-assisted parking), as well as approximately 2,000–3,000 square feet of accessory retail space for tenant use. The development proposal contains a number of other features as well, including landscaping of the site, a tree preservation plan to the rear of the building adjacent to Klingle Valley and the Zoo, a so-called "Klingle Valley Rehabilitation Area" to be established in cooperation with the National Park Service on the north side of the existing building, the permanent closure of an unbuilt street (Jewett Street) on the east side of the site, a storm water management system for the south wing, and various transportation system improvements such as "state-of-the-art" traffic signal activation devices at the driveways of the Kennedy–Warren and the Zoo.

Zoning changes since the 1930s prevent Klingle from carrying out its development plans as a matter of right. The Kennedy–Warren is located on a site that is now zoned R–5–D.[1] The R–5–D designation allows residential apartment buildings with a

---

1. *See* 11 DCMR §§ 350.1 *et seq.* (1995).

The R–5 districts are designed to permit a flexibility of design by permitting in a single

maximum height of 90 feet and a maximum occupancy of 75 percent of the total land area of the lot. 11 DCMR §§ 400.1, 403.2 (1995). The existing Kennedy–Warren complies with those limitations, and the proposed addition is designed to comply with them as well. The height of the new south wing would not exceed 90 feet, and even augmented by that wing, the Kennedy–Warren would occupy only 59 percent of its lot. However, the R–5–D designation also imposes a density limitation, as measured by the floor area ratio ("FAR"),[2] with which the proposed project would not comply. The R–5–D designation permits matter-of-right medium/high density development with a maximum FAR of 3.5. 11 DCMR § 402.4. The proposed south wing would exceed that limit by increasing the FAR of the Kennedy–Warren to 6.29.[3]

In addition, though of lesser import, the design for the south wing project does not fully comply with zoning standards for roof structures and rear yard space. The Zoning Regulations provide for penthouse structures to be in one enclosure, and they impose certain setback requirements for such structures. 11 DCMR §§ 400.7(b), 411.3. In order to comply with a request of the District of Columbia Historic Preservation Review Board, the project design proposes to separate the penthouse into two structures, with corners that would not meet the setback conditions. The design also proposes a rear yard of 25 feet,[4] consistent with original historical drawings for the Kennedy–Warren, rather than a 30–foot rear yard as called for by 11 DCMR § 404.1.

In order to carry out the project, Klingle needed zoning relief. To obtain that relief, Klingle requested that the Commission approve its proposed project as a Planned Unit Development ("P.U.D.") pursuant to 11 DCMR § 2400.3 (1996 Supp.). As part of its application, in order to surmount the existing FAR limitation of 3.5 that prevented it from proceeding with the south wing addition, Klingle asked the Commission to rezone the Kennedy–Warren site from R–5–D to R–5–E and then to grant further relief specially available under the P.U.D. regulations. An R–5–E designation permits higher density development than an R–5–D designation, up to a maximum FAR of 6.0. 11 DCMR § 402.4. Under the P.U.D. regulations, the Commission could then increase the maximum allowed FAR by 5 percent, i.e., up to 6.30. 11 DCMR § 2405.3. In addition to requesting such an increase, Klingle sought waivers of the rear yard and penthouse requirements of the zoning regulations pursuant to 11 DCMR §§ 2405.5, 2405.7.

district, except as provided in §§ 350 through 360, all types of urban residential development if they conform to the height, density, and area requirements established for these districts under chapter 4 of this title. The R–5 districts shall also permit the construction of those institutional and semi-public buildings that would be compatible with adjoining residential uses and which are excluded from the more restrictive Residence districts.
11 DCMR § 350.1. R–5 districts are subdivided into R–5–A, R–5–B, R–5–C, R–5–D and R–5–E districts, based on height and density limitations. The highest height and density is permitted in R–5–D and R–5–E districts. 11 DCMR § 350.2.

2. "Floor area ratio" is a density restriction defined in the Zoning Regulations as "a figure that expresses the total gross floor area as a multiple of the lot. This figure is determined by dividing the gross floor area of all buildings on a lot by the area of that lot." 11 DCMR § 199.1 (1995).

3. In its existing configuration, the Kennedy–Warren has a FAR of 4.58, which also exceeds the limit for an R–5–D district and renders it a "non-conforming structure." See 11 DCMR § 199.1. This reflects the fact that the Kennedy–Warren was built before the present zoning restrictions on density went into effect.

4. As discussed infra, there is a dispute as to the proper measurement of the rear yard that is contemplated in the Klingle proposal.

The P.U.D. process was developed "to encourage[ ] high quality developments that provide public benefits." 11 DCMR § 2400.1. To achieve that objective, the P.U.D. process allows "greater flexibility in planning and design than may be possible under conventional zoning procedures." 11 DCMR § 2400.4. "The overall goal is to permit flexibility of development and other incentives, such as increased building height and density; Provided, that the project offers a commendable number or quality of public benefits, and that it protects and advances the public health, safety, welfare and convenience." 11 DCMR § 2400.2. *See Blagden Alley Ass'n v. District of Columbia Zoning Comm'n,* 590 A.2d 139, 140 n. 2 (D.C.1991). In considering a P.U.D. application, the Commission must find that it satisfies a range of criteria set forth in 11 DCMR § 2403. Of particular relevance to the present case, the Commission must find that the P.U.D. is "not inconsistent" with the Comprehensive Plan for the National Capital, 10 DCMR §§ 100 *et seq.* (1995 and 1996 Supp.) ("Comprehensive Plan" or the "Plan"),[5] and that the "public benefits and

project amenities" of the P.U.D. outweigh its potential adverse effects. 11 DCMR §§ 2403.4, 2403.8.

After receiving a favorable report from the District of Columbia Office of Planning, the Commission held a public evidentiary hearing on Klingle's P.U.D. application. The hearing extended over four evening sessions, beginning on January 6, 1997, and concluding on March 24, 1997. The Commission permitted the Cathedral Park Condominium ("CPC"), represented by a committee of five unit owners, to appear and participate in the proceedings as a party.[6] CPC vigorously opposed the application.

The Commission issued its final decision, including detailed findings of fact and conclusions of law, on September 17, 1997.[7] The Commission approved the proposed P.U.D., adopted the requested change of zoning from R–5–D to R–5–E with an increase in the maximum allowed FAR to 6.29, and granted the requested waiver of the rear yard and penthouse requirements. In brief, the Commission determined that the P.U.D. would not be inconsistent with

---

**5.** The Comprehensive Plan sets forth a broad range of goals and policies to guide decisions by both local and federal agencies in the District of Columbia. The twelve so-called "District Elements" of the Plan were promulgated in stages by the Mayor and Council of the District of Columbia in coordination with the National Capital Planning Commission pursuant to the National Capital Planning Act of 1952, as amended in 1973 by the District of Columbia Self–Government and Governmental Reorganization Act, *see* D.C.Code §§ 1–244 *et seq.* and 1–2003(a) (1999). Subsequent to the decision of the Commission in this case, the Council passed the Comprehensive Plan Amendment Act of 1999, D.C. Act 12–609, 46 D.C.Reg. 1441 *et seq.* (February 19, 1999), amending the Plan in a number of respects. All references in this opinion are to provisions of the Plan as they existed prior to the 1999 amendments. We do not address the impact of the 1999 amendments, if any, on the P.U.D. application in this case. We leave the question of any such impact open for the Commission to consider, if necessary, on remand.

**6.** *See* 11 DCMR §§ 3022.3 and 3022.4 (1995). The Commission also granted party status to the Kennedy–Warren Residents Association, which supported Klingle's application, and to Advisory Neighborhood Commission 3C, which opposed it. Andrea Newmark, an owner-resident of the Cathedral Park Condominium and one of the members of the CPC committee, also sought party status. The Commission denied her request on the grounds that "her interests were already adequately represented by CPC and she did not meet the requirements of" 11 DCMR § 3022.3.

**7.** Prior to issuing its decision, the Commission received project approvals for the proposed P.U.D. from the National Capital Planning Commission (the agency charged with protecting federal interests in D.C. zoning matters), the D.C. Historic Preservation Review Board and the Commission of Fine Arts.

the Comprehensive Plan, but would, rather, further the goals of the Plan. The Commission found that the proposed addition to the Kennedy–Warren would promote the stabilization and improve the physical character of the surrounding residential neighborhood; would advance the housing, urban design and historic preservation elements of the Plan; and would be consistent with provisions of the Plan providing for the protection of open space (or "green space") at the Kennedy–Warren site. The Commission also found that an increase in the maximum permitted FAR to 6.29 pursuant to 11 DCMR § 2405.3 would be appropriate, specifically noting "the Comprehensive Plan designation of the site as high density residential, and the numerous sections in the Comprehensive Plan which direct the encouragement of housing, particularly in close proximity to Metrorail stations, and enhancement of historic properties." Finally, the Commission determined that Klingle had met its burden of showing that the benefits of the P.U.D. would outweigh any negative impact, particularly in light of "the high level of architectural design, the provision of housing in close proximity to two Metrorail stations, the enhancement of a historic landmark, site planning, parking well in excess of the zoning requirements and increased real estate tax revenues for the District."

## II.

CPC, as a committee of five unit owners, petitioned this court to review the Zoning Commission decision in this case. As a preliminary matter, we must address Klingle's contention that the petition must be dismissed as moot. CPC filed its petition for review on January 20, 1998. Thereafter, on September 25, 1998, CPC and Andrea Newmark, CPC's attorney and one of

8. The reason for this transfer of interest, and for the motion, was that Ms. Newmark, an attorney with the United States Department of

its five members, filed a motion requesting this court to add or substitute Ms. Newmark as a party. The motion explained that, as set forth in a "Transfer Letter" attached as an exhibit, the other four committee members of the CPC had transferred their "right, title and interest" in the appeal to Ms. Newmark.[8] This court denied the motion on November 9, 1998, leaving CPC as the sole petitioner.

 Klingle contends that CPC divested itself of any interest in the appeal. Without a proper petitioner with standing to prosecute the appeal, this Court would not have jurisdiction over the matter. *See Lee v. District of Columbia Bd. of Appeals & Review,* 423 A.2d 210, 215–16 (D.C.1980). However, CPC as an entity did not divest itself of anything. The "Transfer Letter" explicitly transferred only the interests of four of CPC's individual members in the appeal to a fifth member (Ms. Newmark), not any interest of CPC itself. Furthermore, CPC still has at least one member (Ms. Newmark) who does continue to claim an interest in the appeal. We conclude that CPC retains its standing to pursue this appeal. *See Hunt v. Washington State Apple Advertising Comm'n,* 432 U.S. 333, 342–43, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (holding that an association may have standing solely as the representative of at least one of its members who otherwise would have standing to sue as an individual); *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

## III.

 CPC contends that the Commission erred in numerous factual and legal respects in approving Klingle's P.U.D. application. CPC also contends that the Commission's proceedings were procedurally unfair in certain fundamental respects.

Justice, sought to participate in this case without appearing as attorney of record on behalf of anyone other than herself.

Our review of these claims is circumscribed. We may set aside an agency action if it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law, or if it is unsupported by substantial evidence in the record. *See* D.C.Code § 1–1510(a)(3) (1999). In reviewing the merits of agency decisions, we examine: (1) whether the agency made a finding of fact on each material contested issue of fact; (2) whether substantial evidence in the record supports each finding; and (3) whether the conclusions of law follow rationally from the findings. *George Washington Univ. v. District of Columbia Bd. of Zoning Adjustment,* 429 A.2d 1342 (D.C.1981); *Foggy Bottom Ass'n v. District of Columbia Zoning Comm'n,* 639 A.2d 578 (D.C.1994). We will defer to the agency's interpretation of the statute and regulations it administers unless its interpretation is unreasonable or in contravention of the language or legislative history of the statute and/or regulations. *See 1330 Connecticut Ave., Inc. v. District of Columbia Zoning Comm'n,* 669 A.2d 708, 714–15 (D.C.1995); *Kalorama Heights Ltd. Partnership v. District of Columbia Dep't of Consumer & Regulatory Affairs,* 655 A.2d 865 (D.C.1995).

## A. Consistency With the Comprehensive Plan

The Commission's enabling statute requires that "zoning maps, regulations, and amendments thereto ... not be inconsistent with the comprehensive plan for the nation's capital." D.C.Code § 5–414 (1994). In addition, the Zoning Regulations require that the Commission find that a proposed P.U.D. not be inconsistent with the Plan. 11 DCMR § 2403.4. Thus,

in this case, the Commission's zoning map amendment changing the designation of the Kennedy–Warren site from R–5–D to R–5–E, its approval of a FAR of 6.29, and its approval of the project as a planned unit development must be consistent with the Plan, whose provisions should be "studied and executed in concert with each other and should be interpreted broadly." 10 DCMR § 112.2.

CPC contends that these decisions violated specific provisions of the Plan relating to the low-density character of Ward 3, development adjacent to landmark parks, the green space in front of the Kennedy–Warren, the height and scale of new construction, and environmental impact.

### 1. Density

CPC cites provisions in the Ward 3 element of the Plan, 10 DCMR § 1400 *et seq.* (1995),[9] which state that the overall low-density character of the ward should be protected. *See, e.g.,* 10 DCMR § 1401.1(c) ("any new development ... must be physically compatible with the predominantly low- and moderate-density character of the ward"); 10 DCMR § 1406.2(d) (stating that "[l]and use and future development must be carefully controlled to protect the existing scale and low density character ... of the ward"); 10 DCMR § 1400.2(a)(2) ("it is a major theme of this ward plan to protect and maintain the low-density, high-quality character of the ward"). CPC claims that in view of these provisions, the high density FAR of 6.29 of the proposed P.U.D. is a violation of the Plan.

In approving an increase in the FAR for the P.U.D. to 6.29, the Commission relied,

---

9. Chapter 14 is entitled the "Ward 3 Plan." The Council enacted ward plans as, collectively, the twelfth District element of the Comprehensive Plan in the Comprehensive Plan Amendments Act of 1989, D.C. Law 8–129, 37 D.C.Reg. 55 *et seq.* (January 5, 1990), and the Comprehensive Plan Amendments Act of

1994, D.C. Law 10–193, 41 D.C. Reg. 5536 *et seq.* (August 19, 1994). In this opinion we refer to the Ward 3 Plan (which is one component of the twelfth District element) as the Ward 3 *element,* in order to avoid semantic confusion when we refer to the "Plan" (*i.e.,* the Comprehensive Plan).

in part, on the District of Columbia Generalized Land Use Map (the "Map"), which is part of the Land Use element of the Plan. *See* 10 DCMR § 1100 *et seq.* (1995). The Map depicts the land use policies of the Land Use element, in terms of the density (low, moderate, medium or high) and use category (*e.g.,* residential or commercial) in which each segment of the city is included. *See* 10 DCMR § 1139.1. The Map specifically includes the site of the Kennedy–Warren in the "high density residential land use" category. That category is defined as follows:

> The high density residential land use category includes *high-rise apartment buildings as the predominant use* and may also include, as appropriate uses, low, moderate, and medium density housing. High density residential land use areas are generally located adjacent to the Central Employment Area, major employment centers, major arterial streets, and appropriate multi-neighborhood and regional commercial centers.

10 DCMR § 1103.4 (emphasis added).

Thus, the Land Use element unambiguously permits high density apartment buildings at the location of the P.U.D. The provisions cited by CPC, on the other hand, address only the overall low to moderate density character of Ward 3. They do not purport to rule out all high density housing projects in the ward, nor do those provisions purport to apply specifically to the site of the Kennedy–Warren. To the extent that there is a residual tension between the cited Ward 3 element sections and the Land Use element, the Plan explicitly authorizes the Commission to resolve that tension in favor of the Land Use element:

> An element may be tempered, even defined, by one (1) or more of the other elements. This may occur both within one (1) element and between elements. *Since the Land Use element integrates the policies and objectives of all other District elements, it should be given greater weight than the other elements.*

10 DCMR § 112.4 (emphasis added).[10]

The Commission also relied on the fact that the Ward 3 element encourages zoning flexibility for the provision of new housing, and specifically for new housing near Metrorail stations (the Kennedy–Warren is in close proximity to two Metrorail stations). *See* 10 DCMR § 1409.4(c)(5). CPC counters that this policy of flexibility is limited to low and moderate income housing. We find that CPC's interpretation is too narrow a reading of § 1409.4(c) and of the policies of the Ward 3 element generally. Section 1409.4(c) states that "[w]here the production of new housing is desirable per this plan, zoning flexibility should be considered, *especially* for the elderly and for low- and moderate-income populations." (Emphasis added). To like effect, 10 DCMR § 1402.4(c) encourages the District government to "[p]rovide zoning flexibility for the production of new housing, *especially* for the elderly and for low- and moderate-income households...." (Emphasis added). While these sections do particularly encourage the production of certain types of housing, they also express support for zoning flexibility for housing in general. *See also* 10 DCMR §§ 1402.3(b) and 1402.4(a).

■ These factors, in conjunction with the designation in the Map of the P.U.D.

---

**10.** Moreover, the Ward 3 element itself identifies "[d]evelopment of multi-family housing on ... Connecticut Avenue[ ] consistent with the land use designations in the Land Use Element" as a development objective. 10 DCMR § 1401.7. *See also* 10 DCMR § 1402.2(d) (Ward 3's "land use policies, as

stated in the Land Use Element, have been developed to provide the greatest housing densities on those corridors that have the best access to transportation and shopping"). Connecticut Avenue is named as one of Ward 3's major transportation and commercial corridors. *See, e.g.,* 10 DCMR § 1402.2(e).

site as high density residential, satisfy us that the P.U.D. is not inconsistent with the Plan by virtue of the provisions in the Ward 3 element that mandate protection of the overall low-to-moderate density character of the ward. However, CPC cites one other provision of the Ward 3 element regarding density, 10 DCMR § 1407.3(c), which states, in pertinent part, that "[d]evelopment adjacent to parks which are designated landmarks must be low density...." [11] CPC argues that the P.U.D. is inconsistent with this requirement, and therefore with the Plan as a whole, inasmuch as the site is adjacent to the National Zoological Park and Klingle Valley.

In response, Klingle argues that the low density development requirement in § 1407.3(c) is tempered by other provisions of the Plan, *e.g.*, the Map designation of the site as high density (and the fact that the site is already occupied by a high density apartment building as a non-conforming structure). Klingle also argues that the concern embodied in § 1407.3(c) is adequately addressed by other components of its application, such as the tree preservation plan and the closure of Jewett Street. Klingle's architects testified, moreover, that the project "would actually better define the vast open space that belongs to the Zoo and Klingle Valley by delineating the boundary between the Kennedy–Warren and those properties." The superintendent of Rock Creek Park of the National Park Service stated that the Service was satisfied with the developer's commitments to mitigate potential effects of the new construction and to enhance the areas between Klingle Valley and the Kennedy–Warren. A National Zoo spokesperson confirmed that the Zoo also did not oppose the project.

In its decision the Commission did not expressly address the requirement of § 1407.3(c) that development adjacent to landmark parks "must be low density." [12] For our part, we are disinclined to interpret and apply that requirement to Klingle's P.U.D. application without benefit of the views of the Commission on the issue. On the one hand, the provision appears sufficiently pertinent to the application that it must be addressed before the application can be evaluated. On the other hand, the import of the provision in the present context is not clear enough to us that we must necessarily agree with CPC that the P.U.D. application is inconsistent with the provision and hence with the Plan as a whole. Moreover, as the Commission is the agency responsible for administering the Plan, we are deferential to its construction of the Plan's provisions. We are therefore constrained to remand to the Commission for findings as to the applicability of the low density development requirement of 10 DCMR § 1407.3(c) and as to whether the proposed P.U.D. is inconsistent with the Plan in light of that requirement. *Cf. Blagden Alley Ass'n*, 590 A.2d at 147.

In articulating its findings the Commission should specifically address, *inter alia*, (1) whether the P.U.D. would not be a "low density" development within the meaning of 10 DCMR § 1407.3(c); (2) whether the National Zoo and/or Klingle Valley are "landmark parks" for purposes of that section; and (3) whether the proposed P.U.D. is "adjacent" to Klingle Valley and/or the National Zoo for purposes of that section. If these questions are answered in the affirmative, the Commission must address whether and to what extent the application of 10 DCMR § 1407.3(c) to the P.U.D. in this case is limited (*e.g.*, by other provi-

---

11. *See also* 10 DCMR § 1406.5(a)(5) (requiring development adjacent to Rock Creek Park and its tributaries [including Klingle Valley] to be low density).

12. As we discuss in the next part of this opinion, the Commission did address other requirements of this same provision.

sions of the Plan or by ameliorative measures). Finally, in light of its answers to these questions, and any other relevant information, the Commission should explain its ultimate conclusion regarding the consistency of the proposed P.U.D. with the Plan as a whole.

### 2. The Buffer Requirement

Another requirement of 10 DCMR § 1407.3(c) is that developments adjacent to landmark parks "shall be further restricted where advisable to . . . promote a green buffer between the built environment and these natural settings." In addition, the development should "minimize any intrusion on views from these parks." *Id.* The Commission found that "[t]o the extent that" a buffer was necessary, the need would be met by a proposed tree preservation plan, developed in coordination with the National Park Service, which would encompass the areas adjacent to Klingle Valley and the National Zoo at the rear of the building (*i.e.*, the east side).

■ CPC challenges this finding, claiming in particular that a buffer was also required on the south side of the P.U.D. site (to the north of the entrance of the National Zoo) and on the west side (facing Connecticut Avenue and "adjacent" to the landmark Cathedral Park building across the street). Our review of the record satisfies us, however, that the Commission's finding is supported by substantial evidence.

First, the Commission noted that the superintendent of Rock Creek Park testified that the construction of the south wing would have "no visible impact on Klingle Valley." The Commission also cited substantial evidence in the record that the tree preservation plan to the east would "provide for aesthetic improvements, soil erosion controls, tree protection and other improvements to stabilize and enhance the areas adjacent to the parkland." Regard-

ing the south side of the lot, the Commission cited evidence that the P.U.D. would result in "little, if any visual impact on the Zoo." This evidence included the testimony of Klingle's architects that the proposed addition was 330 feet from the Zoo entrance, and that the addition would be separated from the entrance by a "large, wooded berm." A National Zoo representative also testified that the Zoo had no aesthetic objections to the project and that the proposed P.U.D. would have no impact on Zoo operations. Finally, 10 DCMR § 1407.3(c) does not require a buffer on the west (Connecticut Avenue) side of the proposed P.U.D., since there is no "landmark park" there. We therefore conclude that the Commission did not err in finding that the proposed P.U.D. was not inconsistent with the buffer requirement of 10 DCMR § 1407.3(c).

### 3. Specific Protection of Green Space on Kennedy–Warren Property

The Ward 3 element of the Plan contains provisions that specifically address the "green space" in front of the Kennedy–Warren on which the south wing addition is proposed to be built. CPC contends that these provisions flatly prohibit construction on that green space and that the P.U.D. is therefore inconsistent with the Plan.

Section 1409.4(a)(3) of the Ward 3 element calls for "stringent protection against infill at inappropriate locations," and states that "[e]xamples of inappropriate infill locations include the swaths of green space fronting many apartment buildings, particularly along Connecticut Avenue (such as . . . *the Kennedy–Warren* . . . .)" 10 DCMR § 1409.4(a)(3) (emphasis added). If the green space fronting the Kennedy–Warren is indeed an "inappropriate infill location," the P.U.D. in this case would appear to conflict with the Plan. *Id.*

Klingle argues, however, that § 1409.4(a)(3) must be read in light of an

earlier section in the Ward 3 element, 10 DCMR § 1407.3(d). According to Klingle, § 1407.3(d) clarifies § 1409.4(a)(3) and establishes that infill development is permissible so long as the green space in question does not "contribute to the integrity of the site or structure." Section 1407.3(d) states:

Many of the apartment buildings along Connecticut Avenue, such a[s] . . . the Kennedy–Warren . . . were built with great swaths of green space in front or large interior open spaces *as a response to building style and the zoning regulations in the 1920s; where these open spaces are recognized to contribute to the integrity of the site or structure,* stringent protection from inappropriate infill shall be maintained [emphasis added].

10 DCMR § 1407.3(d). Klingle argues that the Kennedy–Warren green space (though it is expressly mentioned in this section) was not in fact intended "as a response to building style and the zoning regulations in the 1920s." *Id.* Rather, as witnesses testified and the Commission found, the original developers intended from the outset to construct a south wing on the southern part of the lot, not to create a lawn there. For that reason, Klingle argues, the Kennedy–Warren green space does not "contribute to the integrity of the site or structure" within the meaning of § 1407.3(d). Accordingly, Klingle concludes, the long-delayed construction of a south wing on the Kennedy–Warren green space is not contrary to 10 DCMR §§ 1407.3(d) and 1409.4(a)(3).

In finding that the P.U.D. is consistent with those sections of the Plan, the Commission accepted Klingle's position and stated:

The Ward 3 Plan specifically cites the several historic apartments whose green space should be protected *where that open space is recognized to contribute to*

*the integrity of the site or the structure.* The Kennedy–Warren lawn was *not intended* as open space but rather for the completion of the south wing. The construction of the south wing will not adversely affect the open space *intended* for the site, which would have a lot occupancy of only 59 percent upon completion. The courtyard, which is the central organizing feature of the building and contains approximately 18,000 square feet of open space, would remain. [Emphasis added].

We think that the Commission could reasonably construe §§ 1407.3(d) and 1409.4(a)(3) to permit infill in the Kennedy–Warren green space if that space did not "contribute to the integrity of the site or structure." It is true that both sections state more or less explicitly that infill in that very space is inappropriate; but § 1407.3(d) can fairly be read to incorporate the more general principle that whether infill is inappropriate turns on whether the space *in fact* contributes to the integrity of the site or structure. From that general principle the Commission could reasonably conclude that if—contrary to the evident supposition of §§ 1407.3(d) and 1409.4(a)(3)—the Kennedy–Warren green space does not *in fact* contribute to the integrity of the site or structure, then those sections of the Ward 3 element do not prohibit infill in that space. We therefore defer to the Commission's acceptance of that construction of §§ 1407.3(d) and 1409.4(a)(3). *See 1330 Connecticut Ave., Inc.*, 669 A.2d at 714–15.

That approach does not quite conclude the issue, however. The Commission determined that the Kennedy–Warren green space does not "contribute to the integrity of the site or structure" within the meaning of § 1407.3(d) solely because it found that the original owner intended to develop that space when the apartment complex was built nearly seventy years ago. Section 1407.3(d) juxtaposes the concept of

contribution to the integrity of the site or structure with the premise that the green space was created in the first place "as a response to building style and the zoning regulations in the 1920s." This juxtaposition does suggest that the original intent in creating the green space is a relevant consideration. However, § 1407.3(d) requires stringent protection against infill unless the Commission finds that the space does not contribute to the integrity of the site or structure *at the present time.* Especially since the phrase "integrity of the site or structure" is susceptible to broad interpretation, it is not clear, and the Commission did not explain in its decision, why the original seventy-year-old design for the site is dispositive of this issue.

■ On remand the Commission must, therefore, revisit the question of consistency with 10 DCMR §§ 1407.3(d) and 1409.4(a)(3) and amplify its findings and conclusions. Unless the Commission chooses to adopt a different construction of those sections, it should address whether the Kennedy–Warren green space contributes to the integrity of the site or structure at the present time. To the extent that the Commission considers the original intent to develop the green space to be relevant to, or even dispositive of, that question, it should explain how and why.

### 4. Height and Scale Provisions

CPC claims that the proposed P.U.D. does not comply with "design guidelines" in 10 DCMR § 1406.9 for the height and scale of new construction in "areas of strong architectural character and areas of stable character."[13] The height provision states that "[a]s a general rule" buildings should be constructed "to a height roughly equal to the average height of existing buildings" in the vicinity. 10 DCMR § 1406.9(a). The scale provision states that new structures should "maintain the scale of existing buildings" in the area. 10 DCMR § 1406.9(b). In addition, CPC argues that because the Cathedral Park Condominium has been designated a historic landmark, the proposed P.U.D. does not comply with 10 DCMR § 1407.3(b)(6). That subsection provides that development adjacent to a historic landmark should be compatible in building scale and other design aspects and have no adverse impact on the landmark. Although the proposed south wing would be consistent in height, scale, and overall design with the rest of the Kennedy–Warren, CPC complains that it would be significantly taller and larger than the Cathedral Park Condominium located across Connecticut Avenue. CPC also complains that some Cathedral Park residents will lose their views of the Kennedy–Warren green space if an addition is built on that space.

In approving the P.U.D., the Commission relied in part on the expert opinion testimony of Klingle's architects.[14] They testified that the height and scale of the proposed P.U.D. is consistent with that of nearby buildings along Connecticut Avenue in the Cleveland Park and Woodley Park neighborhoods. Among other things, the architects specifically testified that the Connecticut Avenue corridor was characterized by high density residential apartment buildings varying in height from 60 to 90 feet, and that many of these buildings, including the Cathedral Park Condominium, were constructed on the property line. They further testified that the design of the proposed south wing would avoid the effect of a massive wall along Connecticut Avenue through the use of vertical shafts, recessed courts, and a highly articulated facade. They testified that

---

**13.** *See also* 10 DCMR §§ 709.1–709.2.

**14.** The architects, Warren Cox and Graham Davidson of Hartman–Cox Architects, were qualified as experts in the fields of architecture and preservation architecture.

the "recesses and footprint" of the Kennedy–Warren would in fact be similar to the recesses and footprint of the Cathedral Park Condominium. They also opined that the south wing addition would have a negligible impact on the views and light of the Cathedral Park Condominium.

The Commission also relied upon the submission of the Office of Planning, which agreed that the project would comply with the Comprehensive Plan. The Office of Planning specifically agreed that the proposed south wing would have no adverse impact on light and views of neighboring property because of the expansive open space surrounding the site, including the 130–foot width of Connecticut Avenue that separated it from the Cathedral Park Condominium. The Office of Planning characterized the fact that some units of Cathedral Park Condominium would lose their views of the Kennedy–Warren green space as an inconsequential effect of all development, and not something that could be considered an adverse impact on the neighborhood.

■ In light of this testimony, we are satisfied that there was substantial evidence to support the Commission's finding that the P.U.D. is consistent with the Plan insofar as the height and scale provisions cited by CPC are concerned.

### 5. Consistency With the Plan's Environmental Provisions

■ CPC claims that the Commission erred in finding, as it should under 10 DCMR § 1403.7(b), that the proposed P.U.D. will provide a "net gain for the

ward environmentally" because the Commission based that finding only on mitigation measures resulting from the construction. However, the Commission cited substantial evidence in the record concerning a tree preservation plan and storm water runoff controls to support its position on this point. Even if these were "mitigation measures," that does not in our view detract from the validity of the Commission's finding that the project will provide an environmental "net gain" for Ward 3.[15]

### B. Zoning Regulations

In addition to its contentions regarding consistency with the Comprehensive Plan, CPC argues that in approving the P.U.D. the Commission exceeded its power under the Zoning Regulations. *See* 11 DCMR § 100 *et seq.* CPC challenges the Commission's waiver of the rear yard and penthouse requirements and its finding that the benefits and amenities of the P.U.D. would outweigh its potential adverse effects.

### 1. Waiver of Rear Yard and Penthouse Requirements

■ Although CPC claims that the Commission improperly waived the setback and one-enclosure requirement for penthouses as well as the rear yard requirement, the P.U.D. regulations authorized the Commission to take such action in the exercise of its discretion. The Commission granted relief from the penthouse requirements of 11 DCMR §§ 400.7(b) and 411.3 as a special exception pursuant to 11 DCMR §§ 411.11 [16] and 2405.7 [17] in order to secure approval of the design by the

---

15. Nor are we persuaded by CPC's claim that the Commission abdicated its duty under 10 DCMR § 1403.7(b) in concluding that possible adverse effects caused by blasting to construct the underground parking garage are best addressed by the building and construction codes.

16. 11 DCMR § 411.11 provides in pertinent part:
 Where impracticable because of operating difficulties, size of building lot, or other conditions relating to the building or surrounding area that would tend to make full compliance unduly restrictive, prohibitively costly, or unreasonable, the Board of Zon-

Historic Preservation Review Board. CPC asserts that § 411.11 does not permit a special exception to be made for this reason, but we are not persuaded that the Commission misconstrued the regulation. The Commission could fairly conclude, in light of the Board's position, that the penthouse requirements were "impracticable because of ... conditions relating to the building ... that would tend to make full compliance ... unreasonable." 11 DCMR § 411.11.

The Commission waived the 30–foot rear yard requirement of 11 DCMR § 404.1 pursuant to 11 DCMR § 2405.5[18] in the interest of consistency with the historical design of the project. CPC claims that, properly measured, the depth of the rear yard was only eight feet, not 25 feet as Klingle characterized it.[19] But the Commission was aware of the parties' technical disagreement over how to measure the depth of the rear yard and was aware of what the rear yard would be irrespective of how it was measured. The applicable P.U.D. regulation, 11 DCMR § 2405.5, empowered the Commission to grant the waiver no matter which measurement method was used. We conclude that the dispute over proper measurement of the rear yard depth was immaterial, and we perceive no basis for any claim that the Commission abused its discretion.

### 2. Benefits and Amenities / Adverse Effects

The Zoning Regulations require that in decisions concerning P.U.D. applications, the Commission "shall judge, balance, and reconcile the relative value of the project amenities and public benefits offered ... and any potential adverse effects according to the specific circumstances of the case." 11 DCMR § 2403.8. "Public benefits are superior features of a proposed planned unit development that benefit the surrounding neighborhood or the public in general to a significantly greater extent than would likely result from development of the site under the matter of right provisions of this title." 11 DCMR § 2403.6. "A project amenity is one type of public benefit, specifically a functional or aesthetic feature of the proposed development, that adds to the attractiveness, convenience or comfort of the project for occupants and immediate neighbors." 11 DCMR § 2403.7. The regulations identify nine specific categories of amenities and benefits for potential consideration and provide that the Commission may also take into account "[o]ther public benefits and project amenities and other ways in which the proposed planned unit development substantially advances the major themes and other policies and objectives of any of

---

ing Adjustment shall be empowered to approve the location, design, number, and all other aspects of such structure regulated under §§ 411.3 through 411.6, even if such structures do not meet the normal setback requirements of §§ 400.7 ...; Provided, that the intent and purpose of this chapter and this title shall not be materially impaired by the structure, and the light and air of adjacent buildings shall not be affected adversely.

17. 11 DCMR § 2405.7 provides: "Notwithstanding the other prerogatives of the Zoning Commission in approving uses in planned unit developments, the Zoning Commission shall reserve the option to approve any use that is permitted as a special exception and which would otherwise require the approval of the Board of Zoning Adjustment."

18. 11 DCMR § 2405.5 provides: "Yards and courts shall be provided as otherwise prescribed in this title. However, the Zoning Commission shall have the option to approve yards or courts greater or lesser than the normal requirements, depending upon the exact circumstances of the particular project."

19. Pursuant to 11 DCMR § 404.2, Klingle and the Office of Planning measured the depth of the rear yard "from the center line of the street abutting the lot at the rear of the structure." CPC contended that since Klingle proposed to close that street (Jewett Street) and to dedicate most of the right-of-way to the National Zoo and the National Park Service, there would no longer be a "street" from which to measure.

the elements of the Comprehensive Plan." 11 DCMR § 2403.9(a–j). "A project may qualify for approval by being particularly strong in only one or a few of the categories in § 2403.9, but must be acceptable in all proffered categories and superior in many." 11 DCMR § 2403.10. The applicant has the burden of proof in this regard. 11 DCMR § 2403.2.

In concluding that Klingle met its burden, the Commission found that the applicant had demonstrated a number of public benefits and "meritorious aspects" of the P.U.D. The Commission singled out the "significant public benefit" of 166 additional rental units to "the constricted housing market" in the District, in close proximity to two Metrorail stations. "Housing and affordable housing" is a public benefit specifically identified in the P.U.D. regulations. 11 DCMR § 2403.9(f). The Commission also cited, among other amenities and benefits, the high level of architectural design of the project, *see* 11 DCMR § 2403.9(a); the desirable enhancement of a historic landmark, *see* 11 DCMR § 2403.9(d); the environmental benefits of the project, consisting of storm water runoff controls and a tree preservation plan, *see* 11 DCMR § 2403.9(h); attractive site planning, *see* 11 DCMR § 2403.9(b); transportation improvements and parking in excess of anticipated demand, which would even "help mitigate existing parking problems in the immediate vicinity," *see* 11 DCMR § 2403.9(c); and increased real estate tax revenues for the District. The Commission also concluded that the P.U.D. would have minimal potential adverse impact. It found, for example, that there would be no "light or visual impacts" on adjacent properties, that the tree preservation plan would protect the National Zoo and Klingle Valley, and that the project would not have a negative impact on the

neighborhood or the District from an architectural or urban planning perspective. The Commission found that the project amenities and public benefits outweighed potential adverse effects so as to justify the requested zoning relief and approval of the application.

 It is not our role to reweigh the evidence in the record in reviewing an agency decision. *See Dupont Circle Citizens Ass'n v. District of Columbia Zoning Comm'n*, 355 A.2d 550, 560–61 (D.C.1976); *Stewart v. District of Columbia Bd. of Zoning Adjustment*, 305 A.2d 516 (D.C. 1973) (en banc). Rather, we will uphold an agency's finding if it is rational and is supported by substantial evidence. *Foggy Bottom Ass'n*, 639 A.2d at 585. We are satisfied, based on the extensive evidentiary record, that the Commission's benefit findings meet this standard.

#### a. Housing as a Public Benefit

CPC asks us to hold that the Commission erred in according too much "relative weight" to the provision of additional apartment housing as a public benefit of the P.U.D. CPC contends that under the Ward 3 element of the Comprehensive Plan, only "affordable" housing can be deemed an important public benefit in a P.U.D. located in Ward 3. *See, e.g.,* 10 DCMR § 1409.4(c)(2) (providing that "the provision of elderly and low/moderate-income housing, when it is a substantial portion of a project, ... [is] an important amenity in Planned Unit Developments...."); *see also* 10 DCMR § 1402.5(d) ("finding that the District government should treat housing, when consistent with this ward plan and when for low, moderate, or fixed-income households, as an important public amenity").[20]

 As discussed earlier, however, the provision of new housing is an explicit

---

20. The parties are not in agreement as to the adjective that should be used to describe the Kennedy–Warren apartment complex. CPC

calls it "luxury" housing, while Klingle refers to it as "middle-income" housing. The Commission did not address this precise question

objective of the Ward 3 element. That objective is not limited to housing for the needy, even though such housing is an especial goal. The Ward 3 element therefore did not preclude the Commission from deeming the provision of additional apartment housing to be a public benefit of the P.U.D. in this case. That determination was, moreover, consistent with the identification of housing as a cognizable public benefit in the P.U.D. regulations at 11 DCMR § 2403.9(f). That said, while the value of additional apartment housing at the Kennedy–Warren site was fairly subject to debate, we conclude that the Commission did not abuse its considerable discretion when it exercised its judgment as to how much weight to give this particular benefit in its overall evaluation of the P.U.D. application.

### b. Impact on Neighborhood Parking

The allegedly negative impact of the proposed P.U.D. on neighborhood street parking was a major point of contention in the hearings before the Commission. Louis Slade, the parking and traffic expert for Klingle, and Stephen Petersen, the expert for CPC, differed in their methodologies and in their findings of the number of new parking spaces needed to satisfy demand. Slade calculated that the P.U.D. would generate a need for 118–133 new parking spaces, but Petersen calculated that approximately 240 new spaces would be required. In response to this testimony and to concerns expressed by members of the Commission, the Advisory Neighborhood Commission, and others about possible street parking problems, Klingle ultimately agreed that it would provide 204 fixed and, if need be, 96 attendant-assisted spaces in the new south wing underground garage. Klingle further agreed to require any new tenants of the Kennedy–Warren who own or lease motor vehicles to lease a parking space in the Kennedy–Warren garage as a condition of tenancy.

in its decision. We do not believe it is materi-

Crediting Slade's testimony, the Commission found that Klingle's parking proposal would not only exceed the projected parking demand but would also help ease existing parking problems in the immediate vicinity of the Kennedy–Warren. The Commission further concluded that the provision of 204 fixed spaces plus 96 attendant-assisted spaces—i.e., a total of up to 300 spaces—"more than adequately compensates for any potential errors in calculations associated with the parking requirements and needs for the site."

██ CPC complains of numerous "logical deficiencies" in Slade's data that the Commission allegedly failed to address. Cf. Draude v. District of Columbia Bd. Of Zoning Adjustment, 527 A.2d 1242, 1250 (D.C.1987). We find it unnecessary to decide the merits of this highly technical complaint. The Commission took pains to satisfy itself that the number of parking spaces that Klingle committed to furnish was more than enough to compensate for any underestimate in the number required. We find that the Commission's decision was supported by substantial evidence in this regard. The 300 total spaces in Klingle's proposal exceeded by 25% the number of spaces that even CPC's expert considered necessary. Although CPC suggests that many residents of the Kennedy–Warren would be reluctant to participate in a valet parking plan, the Commission reasonably met this concern by conditioning its approval of the proposed P.U.D. on Klingle's agreement to require tenants with cars to lease an underground parking space. We are satisfied that the Commission's finding that the P.U.D. should not have detrimental effects on street parking availability is supported by substantial evidence.

### c. Historic Preservation and other Issues

██ CPC's remaining challenges to the Commission's benefit findings do not call

al to our resolution of this appeal.

for extended discussion. CPC argues that the Commission improperly found that the proposed P.U.D. constitutes historic preservation because it will not "preserve" a landmark, but will merely add to an already existing landmark structure. We think, however, that the Commission acted within its discretion in basing its finding of a historic preservation benefit on the substantial evidence in the record that the proposed south wing will fulfill a historical design and be compatible in all material details with the existing Kennedy–Warren. The Commission also appropriately based its finding of a historic preservation benefit on Klingle's plans, incorporated in the P.U.D., to rehabilitate ground floor public spaces in the existing Kennedy–Warren structure. One of the purposes of historic preservation is "enhancement . . . of properties of historical, cultural and esthetic merit." D.C.Code § 5–1001(a) (1994). Both improvements to an existing historic structure and fulfillment of a historic design to complete a historic structure may constitute "enhancement."

█ Finally, CPC argues that some of the amenities and benefits that the Commission found, such as superior design or environmental measures, were either required by the Ward 3 element for any discretionary zoning approval affecting Ward 3, *see* 10 DCMR §§ 1406.9(h)(5), 1409.8(c), or were measures taken out of necessity in order to mitigate the impact of the project on the vicinity. CPC contends

that the "relative weight" of these factors must therefore be low. While all this may be true, the Commission did not err in assessing the benefit of these factors, as it was required to do under the P.U.D. regulations. Their weight was arguable, but it was for the Commission to assess.

### C. Fundamental Fairness of Proceedings

CPC claims that the proceedings before the Commission were marred by procedural infirmities that "inhibited a full development of the relevant facts" and rendered the hearing "fundamentally unfair." We are not persuaded by this claim.

CPC's principal assertion [21] is that the Commission unduly limited its cross examination of a witness representing the National Zoo. In December 1996, the National Zoo had furnished a letter in which it expressed apparent "support" for the proposed P.U.D. On January 30, 1997, however, Zoo Director Michael Robinson submitted a second letter in order to "clarif[y]" the Zoo's position. In that second letter Robinson stated that the Zoo neither favored nor opposed the project, but rather was neutral because the proposed P.U.D. would "not impact negatively or positively on the internal operations" of the Zoo. At the hearing before the Commission on February 20, 1997, Ms. Robin Vasa, assistant director for facilities and construction at the Zoo, testified that she had nothing to add to the views presented

---

21. CPC also complains of miscellaneous Commission rulings with respect to oral argument and post-hearing submissions. We have reviewed these claims and find them without merit. The record does not substantiate CPC's contention that it sought but was denied an opportunity to make an oral closing statement at the end of Klingle's rebuttal case. We likewise perceive no error in rulings that rejected post-hearing submissions as untimely or because they were not permitted under the Commission's rules or requested by the Commission. The Commission did not discrimi-

nate against CPC in issuing those rulings. Finally, we are not persuaded that the Commission deprived CPC of a fair opportunity to respond when Klingle agreed, in response to CPC and others, to increase the parking that it would provide in the P.U.D. CPC cross-examined the developer about its agreement to expand the underground garage and provide valet parking. In addition, CPC requested and was granted the right to supplement the record with further argument and evidence concerning the valet parking aspect of that proposal, including an affidavit from its parking expert.

in the letters but was available to represent the Zoo if there were any questions.

In the course of its cross examination of Ms. Vasa, CPC attempted to inquire about a letter that Director Robinson had written eight years earlier, in March 1989. In that letter (which had not previously been made part of the record) Robinson expressed the Zoo's opposition to development on the site of Cathedral Mansions, located across Connecticut Avenue from the entrance to the Zoo between the Metrorail station and the Zoo crossing. CPC's counsel stated that she sought to contrast the Zoo's current neutrality with the fact that it had voiced "aesthetic objection" to development of open space in the vicinity of the Zoo in years past. The Commission ruled, however, that this line of inquiry was beyond the permissible scope of cross examination and invited CPC to present its evidence of the Zoo's past position on other projects during its case-in-chief. The Commission agreed with CPC's counsel that she would have "a lot of latitude" at that time.

 In contested cases before administrative agencies, parties have the right to "conduct such cross-examination as may be required for a full and true disclosure of the facts." D.C.Code § 1–1509(b) (1999); *see Glenbrook Road Ass'n v. District of Columbia Bd. of Zoning Adjustment,* 605 A.2d 22, 38–39 (D.C.1992). The agency, like a trial court, "should permit cross examination to explore any matters which tend to contradict, modify, or explain testimony given on direct." *Hart v. United States,* 538 A.2d 1146, 1148–49 (D.C.1988) (citing *Morris v. United States,* 398 A.2d 333, 339 (D.C.1978)). Matters beyond the scope of direct examination are

"properly left to the opposing party's case-in-chief." *Id.* at 1149 (citation omitted). In its application of these principles, the agency has "broad discretion" in regulating the nature, scope and duration of cross-examination. *Glenbrook,* 605 A.2d at 39 (citation omitted).

 We find that the Commission did not abuse its broad discretion in limiting CPC's questioning of Ms. Vasa. Her testimony on direct was limited to the Zoo's written statement of its neutrality based on its satisfaction that the proposed P.U.D. would not affect its internal operations. The Commission did not prevent CPC from examining Ms. Vasa about how the Zoo reached that conclusion, about factors the Zoo considered or failed to consider, or about the impact the P.U.D. might actually have on the Zoo. CPC specifically cross examined Ms. Vasa about whether the Zoo had considered the loss of green space resulting from the proposed P.U.D. and whether the Zoo had a position regarding the loss of that space. The position that the Zoo took in opposition to prior unrelated projects was only marginally relevant at best to an evaluation of its position of neutrality on the proposed P.U.D. in this case. It was not unreasonable for the Commission to conclude that questioning about such matters was beyond the proper scope of cross examination and more properly undertaken in CPC's case-in-chief as part of an effort to prove the adverse consequences of the P.U.D.[22]

## IV.

For the reasons stated above, we vacate the order of the District of Columbia Zoning Commission and remand for further proceedings not inconsistent with this

---

**22.** Even if the Commission erred in limiting the cross examination, "reversal is appropriate only upon a showing of prejudice." *Committee for Washington's Riverfront Parks v. Thompson,* 451 A.2d 1177, 1184 (D.C.1982). Assuming, *arguendo,* that the Commission

erred, there is no showing of prejudice in this case. CPC had the opportunity to pursue its line of inquiry in its case-in-chief. It has not explained why it did not do so, nor has it proffered any testimony that it was prevented from eliciting.

opinion. On remand, the Commission must address whether the P.U.D. is consistent with the Comprehensive Plan in light of (1) the requirement of 10 DCMR § 1407.3(c) that development adjacent to landmark parks "must be low density"; and (2) the proscriptions in 10 DCMR §§ 1407.3(d) and 1409.4(a)(3) against infill of open space that is "recognized to contribute to the integrity of the site or structure." In all other respects we affirm the decision of the Commission.

*So ordered.*